Case No. 14-5181, U.S. Airline Pilots Association Appellant v. Pension Benefit Guarantee Corporation Mr. Killian for the Appellant, Ms. Connelly for the Appellant You might want to wait a second while your friends are getting ready. Good morning, Your Honors. May it please the Court, I'm Brian Killian on behalf of the U.S. APA. I'd like to reserve four minutes of time for rebuttal. The District Court's conclusion in this case that PBGC fulfilled its duties to the pilots' plan is wrong as a matter of law. The District Court misconceived the nature and the extent of the duties, fiduciary and statutory duties, that PBGC owed to the plan. In particular, the duty to investigate a potential cause of action when the statutory trustee has notice of it. The rule, Your Honors, we ask for is this. Whenever a statutory trustee knows or has reason to know about harm that the plan's former fiduciaries and actuaries caused to the plan, then he must investigate whether those fiduciaries and actuaries are liable to the plan and then must value that cause of action among the plan's assets. This case involved the dramatic pension plan failure. The pilot plan Can I ask you, I don't think any of the parties raised this question, but I want to ask you. Under Heckler, is Heckler, is that a jurisdictional question for us about whether we have any power to review the PBGC decision here because it was committed to agency discretion? Sure. I don't believe that it is a jurisdictional question. Why not? Why not? I mean, if it was under APA, it would clearly be jurisdictional. There's lots of authority out there that says that by forcing that reasoning, it's wrong. The standard of Heckler is that there must be a meaningful standard provided in the statute, some sort of standard that Congress gave the court that it can and is capable of applying. We believe that the court then could look to the statute here and find that there are standards in the statute that the court is capable of applying. As part of our cause of action, I think it would form a defense for the president. My question is whether it's a jurisdictional threshold question that we need to consider, not what the resolution of it would be. I understand. The nature of it, you don't think it's jurisdictional? I don't believe it is, Your Honor. Okay. If you'd like, I could address the Heckler point now that, you know, Congress did provide meaningful standards that this court is capable of applying. It did provide specific duties, the duty to investigate, the duty of prudence, care, and loyalty, and the duty to collect and gather all of the plan's assets. Those duties in the statute are all preceded by the word shall. And as this court said in the Cook v. FDA case, when Congress writes the statute in that way and makes the standard mandatory, it overcomes the Heckler presumption. In addition, this case doesn't even involve conduct, challenge to conduct that PBGC took as an administrative agency. You're the statutory trustee here, right? That's correct. It's its role as statutory trustee. PBGC volunteered for that role. Congress did not require that PBGC become statutory trustee. And when it did so, it became subject to those duties. It knew that those duties would apply as they apply to all other statutory trustees. Congress also gave PBGC power to conduct the investigation as statutory trustee. But in the 10 years since this plan failed, PBGC did not provide a value for any of the plan's causes of action. It admits that. And it admits it never even looked for those. But PBGC can't contend that it didn't have notice of the potential causes of action against fiduciaries and actuaries because it told the bankruptcy court in the termination proceeding about those potential claims. In particular, PBGC told the bankruptcy court that the plan's investment strategy from before the termination exposed plan assets to too much risk. PBGC's expert calculated that there was a 50 percent chance of failure, which we believe is potentially imprudent in a breach of the fiduciary duties. And PBGC said as much in its brief to the court. I'll just read one sentence briefly. PBGC wrote, this so-called prudent investor approach is precisely the type of strategy that failed miserably for U.S. Airways and was largely responsible for the company's unaffordable pension costs that led to the termination of the pilot's plan. PBGC had similarly harsh things to say about the actuarial assumptions that the plan had been using before termination as well. In its own words to the bankruptcy court, it called the assumptions unrealistic, unreasonable, and inappropriate. But doesn't the fact that they were made to the bankruptcy court mean something here? Isn't that a different place, different standard, different circumstances? I certainly recognize that the specific context in which PBGC was raising these issues in the bankruptcy court was different. PBGC was asserting a claim against the plan's sponsor to cover the shortfall between the plan's liabilities and assets on a termination basis. But PBGC did not limit itself in rebutting the other side's arguments to simply arguing why, on a prospective basis, actuarial assumptions that were the same that had been in use before termination were inappropriate. PBGC further said and directly criticized the plan's use of those actuarial assumptions and the investment strategy that had been in place beforehand. And in our view, when a reasonable person who identifies specific conduct like that, which can cause harm and which the third party can under law be liable for, that they must investigate deeper. That is the duty essentially that the law imposes on all plaintiffs when they have actual or inquiry notice of a potential cause of action. The statute of limitations begins to run when they know or have reason to know that someone else has caused them harm or taken some conduct that could potentially cause them harm. Congress imposed essentially that same duty of inquiry on the statutory trustee because the statutory trustee is one step removed from the cause of action because the statutory trustee doesn't bear the risk if the statute of limitations expires. So an affirmative obligation was placed on statutory trustees, and it's essentially the same one that applies to all plaintiffs. You used the phrase red flag. Now, normally when you think of a red flag, you think of something out of the ordinary. But weren't the actuarial assumptions they used being used by many others at the time? They were, Your Honor. Red flag, I think, is shorthand for the know or have reason to know about a potential cause of action. Now, the district court found that the actuarial assumptions that the plan had been using and the investment strategy were similar to those that were used by other plans. And ignoring what PBGC told the bankruptcy court said, for that reason alone, PBGC didn't have to investigate further. We believe that that was wrong for two principal reasons. The idea is that just because everybody's doing it doesn't make it right. Everybody could be doing the wrong thing, and in this case, PBGC has long taught that appropriateness of actuarial assumptions and prudence of investment strategy are plan-specific so that what is appropriate and prudent for one plan. What were the two assumptions? The two assumptions were the retirement age of pilots. The plan had been assuming that all pilots would retire at the age of 60, which is the legal maximum. And in fact, the plan had been seeing retirement somewhere between the age of 56 and 58. And changing that retirement age assumption by two to four years could have a substantial swing on the value of the termination basis of this. The mandatory retirement age is 60. Correct. And pilots, on average, were retiring before they hit the mandatory retirement age. The actual experience of the plan was different than the assumptions that the actuaries had been using. The effect is on the order of about $400 million. Are these all commercial airline pilots? Yes. And for passenger carrier pilots? I believe that's correct, yes. The 60 doesn't apply to Federal Express, does it? I don't know the answer to that question. It doesn't apply to private jets? I don't know the answer to that, Your Honor. I do believe that there was... Actually, we've got some cases on that. And so the other assumption was... Was the expected rate of return. And that was... For most years, the plan was assuming a rate of return of 9.5%. Do you know what the average rate of return for the Standard & Poor's 500 is for the last 20 years? Not off the top of my head, Your Honor. It's 11.6%. So that was a red flag because they were assuming 8% return? The problem, Your Honor, was that the plan was in a position where it could not... Was potentially in a position... I mean, our point, I just want to clarify, is that because the investigation wasn't done, we don't know whether there is, in fact, liability here. But the plan was in a position where its sponsor was not able to cover shortfalls. So ordinary exposure to market risk may very well be prudent for a plan, say, as PBGC's expert told the Bankers' Record, a plan like General Electric, where you know that the plan's sponsor is well-capitalized and able to cover shortfalls in the event that ordinary market risk causes great losses for the plan. But in this case... What was the plan invested in? A wide range of investments from public securities to creative investments in partnerships and the like. It was a broad array. There were billions of dollars of investments, Your Honor. So our point is not necessarily that PBGC would have to investigate every plan that had a 9.5% rate of return. But when PBGC itself told the bankruptcy court that that investment strategy was what partially caused the termination of the plan, the failure of the plan, PBGC can't then become statutory trustee and not investigate it further. A simple investigation into the potential liability of the fiduciaries and actuaries who set on that investment strategy and then who adopted the actuarial assumptions derived from that investment strategy is at least in order. PBGC contends that to do that sort of investigation would consume a substantial amount of resources. We have two responses to that. First, PBGC, in addition to having the duty to investigate, also has a duty of loyalty, and it cannot put its own interests and concerns about expending resources above the beneficiary's interests. But in all events, we believe that PBGC has effectively conceded that this sort of investigation is not particularly onerous. After PBGC's inspector general published the two reports that we've included in the joint appendix that called out PBGC for failing to do complete investigations of plan assets, PBGC apologized and designed new procedures. At the time of the trial in this case, those procedures, I believe, were still being designed, and it's at testimony pages 498 and 506 of the joint appendix. So we don't know actually whether or not these procedures are or will be effective, but the point remains that PBGC's commitment to undertake these investigations going forward demonstrates that it is not exceptionally onerous for the agency to do these investigations as a general matter. One other error of the district court I'll mention before I sit down and let the other side come up is that the district court, in considering the scope of the investigation that PBGC should have undertaken here, assumed only that PBGC would need to investigate the plan's sponsor for the investment strategy and for the actuarial assumptions. But in fact, fiduciaries and actuaries can be liable as well. So the district court's assessment of this was on its face incomplete. And as PBGC admitted in the court below, it never looked into the fiduciaries or the actuaries for what they did in connection with investment strategy and actuarial assumptions. I'll reserve the remainder of my time for today. Thank you very much. Good morning. Good morning. May it please the Court, Paula Connolly for the Pension Benefit Guarantee Corporation. USAPA told the court that this appeal is about whether there was credible evidence of potential wrongdoing by U.S. Airways before this pension plan terminated. PBGC agrees. The district court held a trial on that question, whether there was credible evidence of potential wrongdoing, and found that there was not. This was a finding of fact, subject to the clearly erroneous standard, and it was not clearly erroneous. The essence of this suit is that PBGC committed a breach by not looking for a breach. But USAPA spent nearly three years looking for a breach and didn't identify a single actual claim. What USAPA really wants, and it said this in its brief, is for PBGC to value these hypothetical potential claims for millions of dollars and then, quote, cover the value of those claims, unquote, with PBGC insurance. But it doesn't work that way because value has to include collectability, and there hasn't been a single actual claim, much less a source of collecting those claims, identified in this case. Now, It seems to me a lot of your opponent's arguments come from representations and arguments that PBGC made to the bankruptcy court. So would you deal with that issue? Yes, Your Honor. Late in this case, USAPA came upon arguments that PBGC made to the bankruptcy court. This was a trial about the value of PBGC's bankruptcy claim for the underfunding in the terminated U.S. Airways plan. Now, the value of underfunding in a terminated plan is determined very differently than the value of underfunding in an ongoing plan. ERISA says that PBGC's regulation governs the assumptions for calculating underfunding in a terminated plan. What U.S. Airways was arguing in the bankruptcy court was that one of PBGC's regulatory assumptions for discount rate could be plucked out of its regulation and substituted with a so-called prudent investor rate. That caused the parties to make all kinds of arguments about what was prudent, and I will admit that PBGC energetically defended its bankruptcy claim and how it should be calculated. But PBGC never suggested that there was an actionable fiduciary breach, an action against actuaries for professional malpractice. In fact, PBGC told the bankruptcy court that there's a difference between an ongoing plan and a terminated plan. And I'll quote from the bankruptcy court opinion, PBGC told the bankruptcy court that, quote, the administrator of an ongoing plan would breach no duty by investing in such an asset pool, the asset pool that was at issue there, and assuming an 8% long-term rate of return. So we think that that's a completely different scenario, and PBGC never suggested that there was an actionable fiduciary breach. Just addressing real quickly the actuarial assumptions, USAPA never mentioned these to PBGC, didn't bring it up in its letters, wasn't raised in its complaint. This is probably because choosing actuarial assumptions is not a fiduciary function. Actuarial assumptions are chosen by actuaries who are subject to ethical standards, professional standards, just like attorneys are. The law that applies is not that they can't be unrealistic, inaccurate, unfounded, the kinds of adjectives that you're seeing in these briefs. Instead, actuaries have to use their best estimate of anticipated experience under the plan. And together with other assumptions, they need to be reasonable in the aggregate. There's no evidence that that wasn't met here. In fact, USAPA put on no actuarial testimony at all. There wasn't an actuarial expert report. There wasn't an actuary on the stand, as PBGC did put on. Its only expert witness was an auditor, and he specifically said he wasn't asserting that any actuarial assumptions were unrealistic. USAPA also didn't cite a single case holding an actuary liable for malpractice regarding assumptions chosen. Addressing investment strategy, Department of Labor, the agency that prosecutes fiduciary breaches in ongoing pension plans, investigated this very plan for this very reason in 2004, and the Department of Labor's report on that is in the joint appendix. The Department of Labor used the benchmarks in the plan, found that the investments met the investment policy, that they were diversified, they were balanced. PBGC proved even more at trial that these investments performed better than the market, that the funded status of the plan was better than similar airline pension plans. And USAPA's expert testified, quote, I did not assess the reasonableness of the plan's investment decisions. Just addressing briefly other grounds that this court can affirm, under Heckler v. Cheney, an agency's decisions not to investigate are presumptively unreliable. It's a different role here. The average retirement age. The average retirement age, in the bankruptcy court, Your Honor, PBGC was arguing that its regulatory assumption for expected retirement age, that is an assumption that's in its regulation, applied. And to the extent it addressed expected retirement age at all, it was based on hindsight evidence for a very short span of time. Perhaps ill-advised. Actuaries do not change a plan's long-range expected retirement age assumption based on a short period of time. And there was an early retirement window in effect at that time that affected when people were actually retiring. Just to turn briefly to Heckler v. Cheney, the Supreme Court held that the presumption applies to refusals to investigate. But this seems like the government in a different role here, or the agency in a different role here than the classic law enforcement model where the government's exercising investigative or prosecutorial discretion. Your Honor, we would argue that. It would be a stretch, or it would be something new to take Heckler, I think, to this area. Your Honor, we would say that the agency is the agency. We perform a wide variety of functions, and they overlap, they intertwine. We often sue the same company in the same lawsuit for fiduciary breach and termination liability. Under USAPA's theory, we'd be acting, you know, in one role for part of that lawsuit and another role for part of that lawsuit. If someone else had been appointed the statutory trustee, would they get the benefit of your reading of Heckler? No, Your Honor. That applies to government agencies because they have to balance their— But you're saying it applies to government agencies in all their activities, even when they're acting as a statutory trustee? Well, we would say that that distinction doesn't make sense here because the agency has a wide variety of functions, and they overlap each other and intertwine. There isn't a way to parse them out and neatly label them and separate them as USAPA tries to do here. Another reason for affirming here is that this is not appropriate equitable relief, which is what they're entitled to under Section 1303F. Participants—this is undisputed. Participants cannot benefit from any recovery in this case less than about $500 million. And the district court said that, quote, I don't see how the Pilots Association can gain anything more from this regardless of how the court decides. This is because once PBGC audits plan assets, the law says that any increase or decrease in the value of those assets is suffered by or credited to PBGC. Even in the unlikely event that assets were revalued, they have to flow through the statutory priority categories. They would go first to paying guaranteed benefits before they could go to non-guaranteed benefits. And guaranteed benefits were underfunded by nearly $500 million in this case. Yet another reason that this can't be appropriate equitable relief is that the statute of limitations has run— had run by the time USAPA brought this lawsuit on any of the kinds of claims that they raise here. They run from three to six years, as we detail in our brief. USAPA argues that these violations were in plain sight when PBGC became trustee, that PBGC argued about them in the bankruptcy court in 2003. By 2009, the statute of limitations had run. And finally, just the harm to PBGC and the public of appointing a statutory replacement trustee. This would be a drastic remedy. It's supposed to be only for egregious malfeasance. PBGC is trustee of thousands of pension plans, becomes trustee of 100—roughly 100 more every year. If we need to face this danger in every case, it's dangerous precedent. That could drain the agency's resources, could delay payment of benefits to the participants that we cover. If there are no further questions, we'll rest on our brief. Thank you. Thank you, Your Honors. A few brief points. When PBGC becomes statutory trustee, those fiduciary duties apply to—those that apply to all statutory trustees. It gets the duties and powers that Congress created specially for statutory trustees. In PBGC's argument, you heard Ms. Connolly say several times that USAPA hasn't discovered any actual liabilities. USAPA, as a union, is not empowered to do the sort of investigation that it could even come up with that sort of number. PBGC is, in essence, making a harmless error argument, saying that there's not $500 million worth of claims.  But like all other harmless error arguments, that's PBGC's burden to carry. And PBGC is specially empowered by Section 1342 to do the investigation to decide whether or not there is up to $500 million worth of liability. We don't disagree, Your Honors, that collectability is a component of determining whether a value of a liability—or taking an amount of a liability and then turning it into a value to add to the assets. But without doing any sort of investigation, we don't even know what the bare minimum is for collectability. We don't know what the defendant's assets are like, insurance policies. We don't have an assessment of the likelihood of success because PBGC never did the investigation, even a cursory investigation, come up with that conclusion. The actuarial assumptions— Whose burden is it? Is it your burden as the proponent to establish at least some reasonable cause to believe that the recovery would be more than $500 million? I don't believe so, Your Honor. The court has to prove that it would be less than $500 million? In our view, USAPA satisfies its burden by demonstrating that PBGC has a duty and that it breached that duty. PBGC is now coming in, and that is a legal duty that the statutory trustee owes to us, and the mere breach of it is an injury that this court and the lower court can redress by ordering PBGC to comply with that duty. Now, PBGC contends that, in effect, it's not worth complying with because there isn't going to be $500 million worth of potential claims. We view that as a harmless error argument, and that harmless error argument is something that PBGC, as the one advancing it, has the burden to carry. What's the total plan value? In what sense? Liabilities? Assets? Assets. At the time that the plan was terminated, the assets were just a little over $1 billion, I believe, and the liabilities were over $3 billion. So that's about $2.5 billion. Before you sit down, would you respond to your opposing counsel's point regarding the average retirement age, that that number that you're using is just for a brief period of time, not overall? I believe that the statements that PBGC made in the bankruptcy proceeding were, I have it briefed right here, that, and I'm quoting from page 164 of the second volume of the joint appendix, the average age 60 expected retirement age is unrealistic and unreasonable. It is inconsistent with the actual experience of the pilot's plan and with expected retirement behavior. In other words, and then there's some facts below it that show that in the years leading up to termination of the plan, 71 of 85 retirements in the year 2001 occurred before the age of 60. Over half of the current payees retired before the age of 60. So in 2003, if you look at all beneficiaries currently collecting under the plan going back many, many years, over half retired before the age of 60. So while it is the case that PBGC came up with the age 56 using its regulations, it did not support that age 56 solely on the basis of its regulation. It directly criticized the alternative, 60, because it was inconsistent with the plan's experience in the many years leading up to termination. If there are no further questions, Your Honors, we ask that the judgment of the district court be reversed and remanded so that that court could be the one to decide in the first instance what sort of equitable relief is appropriate. Thank you very much. Thank you. The case is submitted.
judges: Griffith, Kavanaugh, Randolph